GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
JEREMY D. MATZ (Cal. Bar # 199401)
Assistant United States Attorney
Major Frauds Section
MICHAEL R. WILNER (Cal. Bar # 156592)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-0649/0687
     Facsimile:  (213) 894-6269
     E-mail:     jeremy.matz@usdoj.gov
                 michael.wilner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

               FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,       ) No. CR 07-755-DDP
                                )
          Plaintiff,            ) **GOVERNMENT'S POSITION WITH RESPECT**
                                ) **TO PRESENTENCE REPORT AND**
          v.                    ) **SENTENCING FACTORS REGARDING**
                                ) **DEFENDANT KYLE GRASSO**
KYLE GRASSO,                    )
                                )
          Defendant.           ) Hearing:   February 19, 2010,
                                )            at 1:30 p.m.

*

*

*

*

*

*

*

*

*

**TABLE OF CONTENTS**

**PAGE**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Overview of the Fraud Scheme  . . . . . . . . . . . . 3

     B.   Grasso's Role In The Fraud Scheme . . . . . . . . . . 4

          1.   Grasso Helped the Schemers Buy Homes . . . . . . 5

          2.   Grasso Manipulated the MLS . . . . . . . . . . . 6

          3.   Grasso Allowed DPF to Use Cal Title  . . . . . . 6

     C.   Additional Proof of Grasso's
          Willful Criminal Conduct  . . . . . . . . . . . . . . 7

III. THE PRESENTENCE REPORT'S CALCULATION OF
     ADVISORY GUIDELINES  . . . . . . . . . . . . . . . . . . . 8

IV.  THE GOVERNMENT'S ANALYSIS OF THE RELEVANT SENTENCING FACTORS
     LISTED IN 18 U.S.C. § 3553(a) LEAD TO A CONSIDERABLE
     SENTENCE FOR GRASSO HERE . . . . . . . . . . . . . . . . . 11

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 16

i

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Kyle Grasso awaits sentencing for his convictions following a jury trial in this mortgage fraud case.  The jury convicted Grasso of criminal conspiracy, bank fraud, numerous loan fraud counts, and money laundering.  The Probation Office determined that Grasso's advisory guideline range is 97 to 121 months in custody.

The government concurs with that calculation, and ordinarily would not object to a guideline sentence for Grasso within that range.  Grasso played a notable role in the mortgage fraud scheme led by his co-conspirators, Mark Abrams and Elliott Fitzgerald. Grasso assisted those criminals in executing the fraud scheme by corruptly using (a) his position as a real estate agent, and (b) his influence over a title company.  Grasso thereby enabled Abrams and Fitzgerald to profit grotesquely at the expense of their victim-lenders.  The federal sentencing guidelines accurately serve as a starting point for analyzing Grasso's serious, sustained, and illegal misconduct in furtherance of mortgage fraud offenses that resulted in the theft of over $40 million from federally insured lenders.

* * *

Yet, a strict application of the advisory guidelines will lead to an unfair and disparate sentence on Grasso here.  The Court recently sentenced co-defendant Lila Rizk to a term of 36 months in prison.  The Court explained in great detail why it believed that Rizk's sentence was appropriate for a first-time, white collar offender whose criminal conduct was considerably

less severe than the main participants in the scheme.  The Court
candidly expressed its belief that a three-year sentence was
sufficient to punish Rizk for her deliberate, criminal
misconduct, yet allow her the opportunity to rebuild her life
with her family following release from custody.

The government believes that, in light of the Court's
clearly expressed sentencing views, Grasso should receive the
same sentence.  Grasso and Rizk played roughly similar roles in
the mortgage fraud debacle.  Both acted as outside, licensed
professionals who were indispensible in facilitating the fraud at
the behest of Fitzgerald and Abrams.  Both profited handsomely
for their corrupt services, although neither Grasso nor Rizk
benefitted in the same manner as the main fraudsters.  Grasso and
Rizk were, in a "big picture" view, similarly situated in the
fraud scheme, and should receive comparable sentences from this
Court.

The details of Grasso's criminal conduct are more than
sufficient to justify such a result.  The jury verdict against
Grasso established that Grasso: abused his lofty professional
position in the real estate field; misused the Multiple Listing
Service ("MLS"); accepted payoffs in return for access to a
corrupt title insurer; and personally profited from an identical,
illegal transaction involving his personal residence.  The jury's
decision calls for a considerable sentence in this serious
criminal case.  Additionally, such a resolution will send a
strong message of deterrence to the Los Angeles real estate

1  community, which has closely monitored this major mortgage fraud

2  case.

3      So, while the sentencing guidelines recommend a far

4  lengthier sentence for Grasso here, the interests of justice and

5  the Court's prior rulings in this case should lead to a different

6  result.  The government therefore respectfully requests that the

7  Court impose a fair and reasonable sentence of 36 months in

8  custody on Grasso as it did for co-conspirator Rizk.

9  **II.  FACTS**

10     The government concurs with the statement of defendant's

11  offenses in the presentence report.  For the Court's convenience,

12  the government offers a brief summary of the criminal conduct

13  here.[1]

14     **A.   Overview Of the Fraud Scheme**

15     The scheme itself involved fraudulent mortgage loans that

16  grossly exceeded the actual values of the properties that

17  supposedly secured the loans.  Between 2000 and 2003, a group

18  controlled by co-conspirators Abrams and Fitzgerald obtained

19  inflated mortgages on over 90 properties throughout California.

20  The fraud scheme led to actual losses to lenders of over

21  $40 million.  See PSR at ¶ 25.

22

23  _____

24      [1]   Because of the Court's detailed familiarity with this
    case -- from the previous imposition of criminal sentences, the
25  acceptance of guilty pleas from other co-schemers, the related
    civil lawsuit brought by the defrauded lenders, the lengthy
26  criminal trial during the summer of 2009, and the evidentiary
    submissions of the parties regarding post-trial motions -- the
27  government has not resubmitted voluminous evidence with the Court
    as part of this sentencing submission.
28

To implement the scheme, Desert Pacific Financial[2] generally bought lower-priced homes located in affluent neighborhoods and sought mortgages at far above the homes' true values.  In a typical transaction, DPF bought a home on the open market at approximately $1 million, falsely represented it to a lender as having a value of $2.5 million to $3 million, and obtained a mortgage of $1.5 million (or 60-65% of the phony value of the property).  DPF submitted fraudulent purchase contracts, loan applications, appraisals, and title records to convince the lenders of the legitimacy of the transactions.  DPF also used the names and identities of "straw buyers" to obtain the properties and mortgage loans.  See PSR at ¶¶ 15-17.

In the transactions that closed during the course of the scheme, the organization generally made a profit of over $500,000 per deal.  That sum represented the difference between the amount of the inflated loan and the true purchase price of the property. The illegal profits were then split by Abrams and Fitzgerald, their employees, and the outside professionals who assisted DPF in implementing the wide-ranging fraud scheme. See PSR at ¶ 23.

### B.   Grasso's Role In The Fraud Scheme

Grasso was a licensed real estate agent.  The presentence report shows that Grasso applied for his real estate license in 1993.  See PSR at ¶ 140.  Although the presentence report does

---

[2]   Abrams and Fitzgerald operated through several business entities and partnerships.  For the Court's convenience, their organization will be identified as "Desert Pacific Financial" ("DPF") (one of their primary business names) in this memorandum.

4

not contain a full employment history for Grasso, evidence at trial established that, during the relevant period of 2000-2003, Grasso worked at Fred Sands Realtors and Prudential California Realty in Beverly Hills.  <u>See</u> PSR at ¶ 138.  Grasso worked as a team with co-defendant Joseph Babajian.  The Babajian-Grasso team typically acted as agents for transactions involving high-priced real estate on the Westside of Los Angeles.

The evidence at trial showed that Grasso assisted DPF in effectuating the mortgage fraud scheme in several key ways: helping DPF locate and acquire homes used in the fraud scheme; putting false and misleading information into the MLS regarding transactions; and enabling the use of a captive title company to allow the fraudulent transactions to be completed.

### 1.  <u>Grasso Helped the Schemers Buy Homes</u>

Grasso used his position as a Westside realtor to help DPF locate and buy houses used in the mortgage fraud scheme.  With his access to real estate listings, Grasso regularly informed DPF staff about the existence of potential homes that DPF could acquire in the scheme.  <u>See</u> PSR at ¶ 31.  Additionally, Grasso and Babajian acted as agents for DPF and DPF's straw buyers in many of those transactions.  <u>See</u> PSR at ¶¶ 31, 48, 61-63.  In doing so, Grasso was aware that DPF was buying the houses and obtaining fraudulently excessive mortgages from lenders.  Grasso also frequently lied to other participants in the transactions about the true identity of his client and the reason for certain contract terms, especially DPF's requirement that the true purchase prices be kept out of the public eye.  Grasso directly

5

assisted DPF in over two dozen similarly fraudulent mortgage deals.  <u>See</u> PSR at ¶¶ 61-63.

### 2.  Grasso Manipulated the MLS

The Court heard considerable evidence at trial about how Grasso manipulated information in the MLS for the covert benefit of the DPF schemers.  On numerous occasions, Grasso caused phony, inflated listings to be publicized in the MLS.  <u>See</u> PSR at ¶¶ 31, 35, 48-49.  These fake listings were intended to support the bogus appraisal reports prepared by co-conspirator Rizk in connection with the loans.  Additionally, Grasso would convince home sellers and their agents to agree to maintain the supposed confidentiality of DPF's purchase price by deceptively withdrawing a home listing from the MLS, entering a sales price of $0, or reporting the home sold at exactly the list price (even when the actual price was different).  All of these tactics were designed to conceal the true nature of the transaction, and again deceive the mortgage lender from which DPF acquired the fraudulent mortgages.  <u>See</u> PSR at ¶¶ 31, 35.

### 3.  Grasso Allowed DPF to Use Cal Title

When Grasso joined Prudential California in 2001, he became an indirect owner of Cal Title, a title insurance company that became essential to the DPF fraud scheme.  <u>See</u> PSR at ¶ 36. Grasso facilitated the fraud scheme by negotiating the use of Cal Title as title insurers for DPF in numerous deals. Additionally, Grasso coerced DPF to pay him kickbacks in order to use Cal Title in deals in which Grasso did not even act as DPF's real estate agent.  <u>See</u> PSR at ¶¶ 36, 54-59.  Those illicit

payoffs were compelling proof of Grasso's involvement in the mortgage fraud scheme, and were the basis for the jury's guilty verdicts on the money laundering charges in the case.

**C.   Additional Proof of Grasso's Willful Criminal Conduct**

There was more clear proof elicited at trial of Grasso's deliberate and culpable involvement in the mortgage fraud scheme. With the help of the same co-conspirators, Grasso fraudulently inflated the value of his own personal residence in order to obtain a bogus mortgage of his own.  In doing so, Grasso concealed from his lender a set of covert transfers between himself and DPF that constituted a phony down payment on the house.  Grasso also directly lied to the lender about the purchase price of his home, which is a fundamental fact critical to the mortgage lending industry.

Moreover, Grasso had numerous opportunities to withdraw from this conspiracy and avoid facilitating criminal conduct.  Grasso consulted with two sets of attorneys -- including an experienced, federal criminal defense attorney -- to discuss the bogus DPF deals.  All of the attorneys advised Grasso to stop doing business with DPF.  The criminal defense attorney also offered to assist Grasso in approaching law enforcement with his information about the scheme.  Grasso refused all of this advice.  Instead, he continued to collaborate with Abrams, Fitzgerald, and their cohorts throughout the fraud scheme.

7

**III.  THE PRESENTENCE REPORT'S CALCULATION OF ADVISORY GUIDELINES**

The presentence report concludes that Grasso's offense level is 30.  That calculation is based on: (a) a base offense level of 6 for Grasso's fraud convictions; (b) a 20-level enhancement for a loss in excess of $7 million; (c) a 2-level enhancement for sophisticated means used in the offense; and (d) a 2-level enhancement for abuse of a position of trust.  See PSR at ¶¶ 76-86.  With a criminal history category of I based on no previous criminal convictions, the presentence report concludes that Grasso's advisory sentencing guideline range is 97 to 121 months.  See PSR at 4.

The government agrees with the presentence report's analysis of Grasso's guidelines.[3]  The evidence presented to the Court during trial is far more than sufficient to establish the guideline enhancements in the presentence report, including the fraud loss attributable to the mortgage scheme.  When an enhancement has an "extremely disproportionate effect" on a sentence the district court may be required to apply a clear and convincing evidence standard.  United States v. Munoz, 233 F.3d 1117, 1127 (9th Cir. 2000); but see United States v. Treadwell,

_____

[3]  The presentence report's guideline calculation does not address Grasso's convictions for the money laundering offenses. While those convictions likely merge into the significant fraud-based offenses, the guidelines call for an separate analysis of the 1956 crimes under USSG § 2S1.1.  However, the government recognizes that the money laundering convictions will not ultimately affect the final guideline calculation here.  Of course, the fact that Grasso sought and received bribes (that is, the factual conduct that underlies his money laundering crimes) is extremely relevant in crafting an appropriate sentence for his deliberate criminal activities.

8

1   ___ F.3d ___ (9th Cir. Jan. 28, 2010) (affirming use of the

2   preponderance standard for calculating loss in fraud case where

3   defendant convicted at trial of conspiracy to participate in

4   fraud scheme); <u>United States v. Berger</u>, 587 F.3d 1038, 1048-49

5   (9th Cir. 2009) (same).

6        Here, the clear and convincing proof at trial established

7   that Grasso participated in several dozen fraudulent home

8   mortgage transactions with DPF.  In those transactions, Grasso

9   manipulated the MLS, represented DPF in negotiations, and/or

10  allowed his captive title insurance firm to be used, all of which

11  facilitated the mortgage fraud scheme.  The losses attributable

12  to those transactions combined with the personal gains that

13  Grasso received were over $13 million.[4]  <u>See</u> PSR at ¶¶ 77-79.

14       The sophisticated means enhancement under USSG

15  § 2B1.1(b)(8)(C) applies here.  As the presentence report

16  insightfully notes, Grasso altered important MLS computer records

17  and engaged in extraordinarily corrupt actions to obtain crucial,

18  false title insurance materials from Cal Title.  Additionally,

19  Grasso was well aware that DPF used "straw buyers" and nominee

20  purchasers in order to acquire the properties from sellers.

21  These complicated real estate maneuvers fall well within the

22  "complex or intricate offense conduct" that merits the

23  sophisticated means enhancement.  <u>See</u> PSR at ¶¶ 80-81.

24

25

26  _____

27       [4]  The government does not challenge the fraud loss
    calculation for Grasso's offense (which is lower than that used
28  in Rizk's calculation) here under Section 2B1.1.

9

1    Additionally, the presentence report determines that Grasso
2    abused a position of private trust under USSG § 3B1.3 in these
3    deals.  As a real estate agent, Grasso owed fiduciary duties to
4    clients in the transactions.  See PSR at ¶ 82.  The Court heard
5    evidence at trial that Grasso was a respected, high-level
6    professional within the Fred Sands and Prudential California real
7    estate organizations.  He also was a leader of a team that
8    provided real estate services to clients.  Those characteristics
9    merit the enhancement for abuse of a position of trust.
10   See United States v. Contreras, 581 F.3d 1163, 1168 (9th Cir.
11   2009) (enhancement applies where defendant was "a supervisor,
12   professional, or manager"; occupied a "significant position of
13   authority" at work; and "exercised . . . 'professional or
14   managerial discretion.'").

15   Alternatively, the same enhancement applies where a
16   defendant abuses a special skill in a manner to significantly
17   facilitate the offense.  Grasso clearly satisfied that standard
18   with his misconduct here.  Grasso was a state-licensed real
19   estate agent who represented DPF as an agent in numerous
20   transactions.  By virtue of that professional license -- and the
21   considerable professional prestige that Grasso and Babajian had
22   earned in the industry over the years -- Grasso was able to help
23   DPF obtain the homes in the fraudulent deals.  Grasso's skill as
24   a licensed real estate agent was vital to him closing
25   transactions for his co-conspirators.  The position of trust/
26   special skill enhancement thoroughly applies here.

27
28
                                    10

The government concurs in the Probation Officer's decision not to reduce Grasso's offense level for any purported acceptance of responsibility (the report notes that Grasso refused to discuss the offenses when interviewed for the presentence report).  See PSR at ¶ 68.

**IV.  THE GOVERNMENT'S ANALYSIS OF THE RELEVANT SENTENCING FACTORS LISTED IN 18 U.S.C. § 3553(a) LEAD TO A CONSIDERABLE SENTENCE FOR GRASSO HERE**

The government respectfully requests that the Court sentence Grasso to a below guidelines term of 36 months in custody.  Such a sentence would accurately reflect Grasso's essentially equal culpability as compared to Rizk.  The government believes that the facts and evidence in this case could certainly support a sterner sentence for Grasso.  However, the principles of deterrence, punishment, and proportionate sentencing based on the participant's overall role in the offense (as the Court articulated at Rizk's recent sentencing) justify identical sentences for the licensed professionals who deliberately assisted the Abrams-Fitzgerald organization in the scheme.

The government readily acknowledges that Grasso was not at the center of this fraud scheme -- Fitzgerald and Abrams were.  Similarly, Grasso did not profit from the crimes in any way approaching the DPF principals.  Grasso also had no apparent involvement in bogus transactions that DPF orchestrated in other parts of California.  However, the jury convicted Grasso because of his direct, culpable participation in many deals in Los Angeles, including his solicitation of kickbacks from the

11

Abrams-Fitzgerald organization.  The Court should impose an
appropriately severe sentence on him for those criminal actions.

The nature and circumstances of the offense and the history
and characteristics of the offender justify a significant prison
sentence.[5]  Grasso's role in the scheme changed over time.  But
throughout the scheme, Grasso knowingly and willingly helped DPF
rip off the mortgage lenders.  DPF was only able to repeatedly
execute the mortgage fraud scheme because of corrupt real estate
professionals like Grasso.  Grasso enthusiastically helped DPF
find houses on the Westside that were suitable for the scheme --
that is, houses of the right price and in the right neighborhoods
to justify inflated valuations.  Grasso then helped DPF buy the
properties using bogus names, deceptive contract terms, and other
tactics to conceal the true nature of the deals from the sellers,
the sellers' agents, and the lenders.  Grasso did so despite his
personal and direct knowledge that DPF was getting excessive
mortgages on the homes.

Indeed, Grasso used DPF's fraudulent services for his own
benefit in an identical manner when Grasso fraudulently inflated
the price of his own house in a mortgage transaction.  In doing
so, Grasso lied to a lender about the value of his house and
concealed a large downpayment that he covertly received from
Abrams in order to fraudulently obtain an oversize mortgage on
his own house.  Grasso collaborated closely with Abrams to
effectuate the bogus deal on Grasso's property.

---

[5]    18 U.S.C. § 3553(a)(1).

Grasso was willing to use his professional position in other ways to help Abrams and Fitzgerald. Grasso repeatedly input false information in the MLS about properties that DPF bought or tried to buy. By tinkering with the contents of this database, Grasso deliberately intended to deceive lenders and the real estate community on behalf of his clients. Grasso also assisted DPF in obtaining crucial title records and insurance through Cal Title. Grasso even demanded that DPF pay him for access to Cal Title, regardless of whether Grasso performed any services in the deals. This brazen misconduct was the basis for the jury's guilty verdicts on the money laundering counts in the indictment. It also speaks volumes about Grasso's criminal intent here -- Grasso was in a position to demand payoffs from Abrams and Fitzgerald to allow them to continue to commit what Grasso knew was a scheme to defraud banks.

Moreover, the only way that Grasso was able to assist the criminals at DPF was because of his real estate license and his prominent position in the real estate industry. At trial, Grasso argued that he was innocent of misconduct because professionals in his position would not participate in a criminal scheme like this. The reality is that Grasso was able to get away with committing these crimes because his reputation in the industry was essentially pristine. The real estate agents involved in the sales side of the deals who testified at trial stated that they had no suspicions about the deals because Babajian and Grasso were involved for the buyers. Little did they know, of course, that Grasso concealed the truth about the deals from them.

13

1   Grasso's willingness to lie -- to sellers, to professional
2   colleagues, to his own lender, and to other financial firms --
3   weighs heavily against him at sentencing.

4        A sentence of 36 months in custody for Grasso will foster
5   the statutory goals of reflecting the seriousness of the offense,
6   promoting respect for the law, punishing this offender, and
7   affording deterrence to criminal conduct in the same manner as
8   with Rizk.[6]  This case has generated considerable attention in
9   the local real estate community.  Grasso was already a prominent
10  player in Westside realty when he chose to conspire with Abrams
11  and Fitzgerald.  Many real estate agents are disturbed by the
12  extent of Grasso's illegal actions over the course of several
13  years and numerous transactions here.  A three-year sentence for
14  a prominent real estate agent who participated in a multi-million
15  dollar fraud scheme will have significant impact on the real
16  estate industry.

17       The government notes Grasso's continued disrespect for the
18  rule of law here.  Like all of his co-defendants, Grasso
19  committed these crimes for personal gain.  He received hefty
20  commissions for representing DPF in the deals.  He received
21  kickbacks for allowing DPF to use Cal Title in certain deals.
22  Grasso also committed fraud in his personal mortgage transaction.
23  Throughout this period, he anticipated even greater commission
24  payments from Abrams and Fitzgerald in the event that any of the
25  "trophy properties" that DPF was building were sold.  Respect for
26  the law, the ethics of his profession and his license, the rules

27  _____

28       [6]    18 U.S.C. § 3553(a)(2)(A-B).

14

of his employers, and common sense could not prevent Grasso from assisting DPF here.  Directly put, Grasso's greed trumped all of those.  The Court may properly consider a substantial sentence against an offender who demonstrated his disrespect for the rule of law over such a long period of time.[7]

Finally, after reviewing the presentence report, the government does not believe that Grasso requires any special "educational or vocational training, medical care, or other correctional treatment"[8] in lieu of a custodial sentence here, and will review Grasso's sentencing filing to see if he addresses this issue.

---

[7]    The Probation Officer notes that Grasso refused to comply with the provisions of General Order 03-01 by failing to provide documentation regarding his assets.  See PSR at ¶ 162. Additionally, the Probation Officer concludes that "Grasso made inconsistent statement[s] during the presentence stage" regarding his involvement with his current business.  See PSR at ¶ 163. The Court may consider the Probation Office's conclusions in evaluating the appropriate sentence here.

[8]    18 U.S.C. § 3553(a)(2)(D).

15

1  **V.**     **CONCLUSION**

2          The evidence at trial proved that Grasso was thoroughly

3  complicit in the Abrams-Fitzgerald fraud scheme.  From

4  manipulating computerized MLS records to lying to follow realtors

5  to lying about his own mortgage transaction, Grasso clearly and

6  willingly joined forces with DPF to facilitate the corrupt

7  mortgage deals.  Grasso culminated his misconduct with his

8  pay-to-play demands regarding access to his firm's title company.

9  The jury agreed, returning convictions against Grasso on the

10  serious charges in the indictment.

11          In recognition of the comparative roles of the participants

12  here, however, the government believes that a below-guideline

13  sentence is appropriate.  The government respectfully requests

14  that the Court impose a sentence of 36 months in custody on

15  Grasso as it did with co-conspirator Rizk, along with the other

16  sentencing recommendations and terms, including restitution, as

17  recommended by the Probation Office.

18

19  Dated: February 8, 2010        Respectfully submitted,

20                                 GEORGE S. CARDONA
                                   Acting United States Attorney
21
                                   CHRISTINE C. EWELL
22                                 Assistant U.S. Attorney
                                   Chief, Criminal Division
23
                                         /s/ AUSA Wilner
24                                 _____
25                                 JEREMY D. MATZ
                                   MICHAEL R. WILNER
26                                 Assistant United States Attorneys
                                   Major Frauds Section
27
                                   Attorneys for Plaintiff
28                                 UNITED STATES OF AMERICA

                                   16